[Cite as *In re R.W.*, 2025-Ohio-3286.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE R.W.                                  :
                                            :            No. 114806
A Minor Child                               :
                                            :
[Appeal by Mother, L.W.]                    :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 11, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD23906800

---

## *Appearances:*

David S. Bartos, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, for *appellee*.

ANITA LASTER MAYS, J.:

{¶ 1} Appellant L.W. ("Mother"), who was 16 years of age at the time the case was initiated (d.o.b. 11/18/06), contests the juvenile court's termination of Mother's parental rights to minor child R.W. (d.o.b. 4/6/23) and the award of permanent custody to the Cuyahoga County Division of Children and Family

Services ("CCDCFS" or the "Agency").[1]  After a thorough review of the record and applicable law, we find no merit to Mother's claimed errors that (1) the juvenile court's decision was against the manifest weight and sufficiency of the evidence, and (2) trial counsel's performance was ineffective.

{¶ 2}  The juvenile court's judgment is affirmed.

## I.    Background and Pertinent Facts

{¶ 3}  On June 9, 2023, the Agency filed a complaint for temporary custody of R.W. due to abuse and neglect under R.C. 2151.031(D) and 2151.04(B) respectively, and for predispositional emergency custody.  On the same date, R.W. was committed to the emergency care and custody of the Agency by ex parte telephonic order.  Due to Mother's age of 16 years, Mother's mother ("Maternal Grandmother") and Mother's father ("Maternal Grandfather") were made parties to the case and each was subsequently appointed counsel and a guardian ad litem ("GAL").

{¶ 4}  The Agency contended in the complaint that Mother used marijuana throughout her pregnancy, received no prenatal care, and both Mother and R.W. tested positive for marijuana/tetrahydrocannabinol ("THC") at R.W.'s birth.  R.W. was born prematurely with multiple medical issues.  The complaint also stated that Mother was in the eighth grade and  was covered by an individualized education plan ("I.E.P.").  Mother also suffered from mental-health issues and cognitive delays

---

[1]References to the child are listed in the record interchangeably as "R.W." and "R.R.W.," which are both correct, representing first and last name and first, middle and last names.

that interfered with her ability to provide appropriate care for R.W. and to understand and meet R.W.'s specialized medical needs.

{¶ 5} Alleged father R.B., also a minor, was ultimately excluded from paternity and unidentified alleged father John Doe failed to establish paternity, support, visit, or communicate with the child since birth. Maternal Grandmother and Maternal Grandfather were unsuitable for care due to issues including marijuana and alcohol abuse.

{¶ 6} The emergency temporary custody hearing was held on June 13, 2023. The juvenile court heard testimony and found probable cause for R.W.'s removal under R.C. 2151.31.

{¶ 7} The August 2023 report of R.W.'s GAL recommended granting temporary custody to the Agency. The GAL reviewed the case records, including the Agency-formulated case plan that outlines the steps Mother must take to resolve the reasons for the child's removal, and successfully contacted R.W., his caregiver, Mother, and social workers. R.W. was born at 28 weeks gestation with multiple medical issues: bladder exstrophy, possible hip dysplasia; tethered umbilical cord, imperforate anus, retinopathy of prematurity, congenital widening of symphysis pubis, atrial septal defect, and single umbilical artery.

{¶ 8} The report also reveals that Mother advised the GAL that she believed the weekly urine screens mandated by the Agency's case plan were negative though the Agency reported that only a single screen was provided on July 6, 2023. Mother told the GAL that she was enrolled in online school for the tenth grade and was

willing to perform case-plan services because she loves her baby.[2] Relatives that the Agency investigated for temporary placement were not approved.

{¶ 9} The August 30, 2023 magistrate's decision recommended that R.W. be adjudicated abused and dependent. The juvenile court's September 18, 2023 judgment entry and findings of fact adopted the magistrate's decision by clear-and-convincing evidence. The juvenile court determined there were no relatives willing or able to provide care for the child. The Agency was to conduct weekly home visits, ensure housing was appropriate and basic needs were being met, confirm that Mother was attending school consistently, provide Mother with transportation to attend medical visits for R.W. and drug tests, and present testimony at the next hearing regarding Mother's housing and Maternal Grandmother's case-plan compliance.

{¶ 10} The October 18, 2023 magistrate's dispositional review determined that Mother was attending counseling sessions, was scheduled to begin parenting classes, and continued to test positive for "alcohol and/or illegal substances." A case had been opened with the Agency for Maternal Grandmother due to mental health, substance abuse, and deplorable housing conditions involving Mother and her five- and two-year-old siblings. The Agency workers advised that Maternal

---

[2]This court is aware of the discrepancy between the statement that then 16-year-old Mother was in the eighth grade as a factor supporting the June 9, 2023 complaint and Mother's statement to the GAL that she was in the tenth grade and wanted to keep her child.

Grandmother's home was not appropriate for R.W. The case plan contained concurrent goals of reunification and adoption.

{¶ 11} The November 2023 GAL report recommended continued temporary custody. R.W. had colon and bladder repair surgery, will require a catheter for potty training, and wears a medical helmet. The foster mother provided excellent care, Mother needed to continue with case-plan services and comply with drug screens, Maternal Grandmother had an open case with the Agency involving Mother and her two siblings, and Maternal Grandfather indicated he did not want to be involved in the case.

{¶ 12} The November 6, 2023 dispositional review judgment entry approved and adopted the October 18, 2023 magistrate's decision.

{¶ 13} On April 25, 2024, CCDCFS moved to modify temporary custody to permanent custody under Juv.R. 19 and R.C. 2151.413. The Agency alleged that despite the Agency's reasonable efforts to prevent removal of R.W. from the home, removal was in R.W.'s best interest. The reasons for temporary custody had not been resolved. Mother needed to complete case-plan services and training to care for R.W.'s medical needs as well as substance-abuse services and to attend school or participate in remote learning. Mother was still residing with Maternal Grandmother and Mother's siblings, and Maternal Grandmother's open case with the Agency due to mental health, substance abuse, and housing issues involving Mother and Mother's two siblings was pending.

{¶ 14} On May 7, 2024, the juvenile court determined there was reasonable cause to continue temporary custody pending the permanent custody hearing.

{¶ 15} The June 6, 2024 semi-annual report ("SAR") reveals the continued lack of progress to complete case-plan services and Maternal Grandmother's ongoing failure to assist Mother. Maternal Grandmother refused to allow Mother to live with an appropriate relative so that Mother could care for R.W.

{¶ 16} The GAL's October 2024 report revealed that, at 18 months, R.W. could sit up and roll back and forth but not crawl or walk. Mother was required to receive abdominal gastrostomy tube ("G-tube") training for visitation with R.W. and had not visited R.W. for several months but texted in September 2024. The GAL had been unable to contact Mother regarding the permanent-custody motion but knew that Mother desired reunification. Mother had not completed case-plan services. Maternal Grandmother's Agency case was dismissed without prejudice due to expiration of the statutory time. Maternal Grandfather did not want to be involved, and no relatives for potential placement were identified. The GAL recommended awarding permanent custody to the Agency.

{¶ 17} On October 10, 2024, the parties appeared for trial. The juvenile court granted Mother's request for a continuance to allow additional time for Mother to complete case-plan services. Trial was set for January 7, 2025.

{¶ 18} The November 7, 2024 SAR noted Mother's failure to provide 22 drug screens and the one screen provided was inconclusive. OhioGuidestone reported Mother was not benefitting from mental-health services because she did not seem

to be particularly engaged, often responding with one-word answers. Visitation between Mother and R.W. could not occur due to Mother's inability to care for R.W.'s G-tube due to failure to attend training, and neither the Agency nor transportation personnel were trained to do so, potentially exposing the Agency to liability. R.W. will require future surgeries as he grows, has physical and cognitive delays, and is serviced by multiple specialists through Akron Children's Hospital including ophthalmologists.

## II. Dispositional Permanent Custody Hearing

{¶ 19} The hearing on CCDCFS's April 2024 motion for permanent custody was held on January 7, 2025, two months after Mother's 18th birthday. In attendance were Mother's counsel and GAL, R.W.'s GAL, counsel for the Agency, Agency worker Melanie Green, and Maternal Grandmother. Mother and Maternal Grandfather appeared via Zoom.[3]

### A. Agency Worker Green

{¶ 20} Melanie Green ("Green"), employed as an "Ongoing Worker in the START Department" of CCDCFS, was assigned to the case on February 29, 2024.[4] Green had reviewed and was familiar with the case file. R.W. was one year (and nine months) old at the time of trial.

---

[3] Prior to testimony, the juvenile court granted the Agency's motion to remove Maternal Grandfather and Maternal Grandmother as parties due to Mother reaching the age of 18. Their assigned GALs and counsel were excused from the proceedings.

[4] Ohio "START" stands for Society, Treatment and Reducing Trauma. https://ohiostart.org/ (accessed July 9, 2025).

{¶ 21} Green testified that Mother had a childhood history with the Agency through Maternal Grandmother and an open case at the time of R.W.'s birth. R.W. tested positive for marijuana at birth and was born with "significant medical needs" that Mother was and is unable to care for.

{¶ 22} R.W. was declared abused and neglected, and the Agency obtained emergency temporary custody. A case plan for reunification was prepared. Mother was offered services for substance abuse, mental health, parenting and housing. Mother "engaged" in mental-health services with OhioGuidestone but not for alcohol and drug treatment. Tr. 18.

{¶ 23} Weekly drug screening was requested by the Agency as part of Mother's case plan, but Mother's participation was inconsistent. "We typically get a screen [from Mother] maybe twice a year." Tr. 18. Since Green was assigned to the case, Mother provided "maybe three screens throughout the 2024 year." Tr. 18. The last screen provided was on November 8, 2024, and was negative for all substances. Mother has failed to comply with approximately eight requests for screens since that date.

{¶ 24} Mental-health engagement has been inconsistent. Green stated that "the last real progress report" received from OhioGuidestone "was in the spring of 2024, and they stated that although they were meeting with her on a weekly basis in the home that she shared with Maternal Grandmother, they did not see a benefit of services." Also,

[Mother] was, in terms of their therapy with her, she was very like one-word answer with them in regards to what was going on in her life. There were critical pieces of information that they should have known about that they did not know. One being that her child was medically fragile, and the nature of this open case stemming around substance use and her child being significantly medically impaired.

Tr. 19.

{¶ 25} Green stated she discussed the progress report with Mother and encouraged her to engage for assistance with life skills, functioning, and mental health.[5] Mother did not provide a "sufficient rationale for why things are not being engaged in," particularly since OhioGuidestone was meeting with Mother at Maternal Grandmother's house. Mother had completed a curriculum-based parenting program but it was not tailored to Mother and R.W. and did not address R.W.'s "significant medical needs." Tr. 21, 22.

{¶ 26} Though Mother maintained that she resided with Maternal Grandmother, she was rarely at the residence when Agency staff visited, sometimes by appointment and other times unannounced. Thus, it has been difficult to engage face-to-face with Mother, which was the preferred way to communicate due to her youth. Green was not aware of any independent efforts by Mother to obtain assistance with case-plan services.

{¶ 27} R.W., who was one year old in April 2024 when the Agency filed its motion for permanent custody, has been placed in a licensed medical foster home.

---

[5] The juvenile court interjected for the record that Mother had input into the Zoom chat that Green "just had me call the lady yesterday." Mother was admonished not to enter information in the chat and to wait until Green's testimony concluded to provide input to or ask questions of Mother's attorney.

R.W. is developmentally delayed, is nourished through a G-tube, does not walk or talk, and recently began sitting up, scooting around, and crawling.

{¶ 28} Mother has been encouraged to but rarely participates in R.W.'s medical and therapy appointments and would not be able to serve as a primary caregiver providing services to R.W. or transporting him to appointments. Mother finally participated in G-tube training in November 2024 but the Agency's attempts to arrange visits between Mother and R.W. in December were unfruitful. Mother's failure to participate in the December 2024 medical appointments the month prior to the dispositional hearing, either in person or virtually, was a "huge concern" to the Agency." Tr 26.

{¶ 29} Mother's last visit with R.W. was in February 2024 though she attended the April 2024 G-tube insertion surgery. Green conducts monthly visits with R.W. and the caregiver. Mother's contacts with the caregiver are inconsistent and are via texts from various phone numbers.

{¶ 30} Regarding potential caretakers for R.W., Green stated, "I have put in four or five KCARs [kinship care requests] for various relatives, siblings of [Mother], an aunt of [Mother], most recently, her paternal aunt, that was the last KCAR that was submitted, and none of them panned out for various reasons." Tr. 28.

{¶ 31} Mother advised Green that she was enrolled in a remote-learning program at a local Cleveland high school. Green discovered that Mother was enrolled in in-person learning at the school but "thought" she was a remote-learner. Tr. 29. Green obtained information from the school for Mother to begin remote

learning and provided the information to Mother, Maternal Grandmother, Maternal Grandfather, and Mother's paternal grandmother via group chat.

{¶ 32} Mother and Maternal Grandmother attended the remote-learning orientation and were provided with the requisite equipment in October 2024. The day prior to trial, Green learned from Mother that she had not logged into any remote-learning classes and planned to, at some point, have Maternal Grandfather take her to resolve the matter.

{¶ 33} Green endorsed granting permanent custody to the Agency. The caregiver was not interested in adoption but identified potential adoption parties who were part of R.W.'s "normalcy and his kinship" in the caregiver's home who were interested and familiar with R.W. Green could not say whether "any of those individuals are going to be who the Agency recommends." Tr. 32.

{¶ 34} Green testified that the Agency has also identified other medically licensed foster homes who were interested in adoption but could not "guarantee that [R.W.] will not undergo a placement change upon permanent custody being granted." Tr. 32-33.

{¶ 35} Prior to Mother's cross-examination of Green, the juvenile court recessed to allow Mother, Maternal Grandfather, and Mother's grandfather to consult with Mother's counsel and GAL. Green confirmed that Mother was required to be accompanied by an adult for drug screens. Green was not aware that Maternal Grandfather took Mother for drug screens five times but knew Maternal Grandmother took Mother once in July 2024. Green explained that, due to caseload

and responsibilities, personally transporting Mother for drug screens was "not generally a task that would be on me to do." Tr. 35.

{¶ 36} Green stated that though the "last real progress report" was provided by OhioGuidestone in spring 2024, she communicated with the organization in October 2024, but was not advised by OhioGuidestone or Mother that Mother had been assessed in October 2024. Mother provided no evidence at the hearing that the assessment actually occurred.

{¶ 37} Green confirmed that R.W.'s caregiver placement and medical care are in Akron, Ohio, because that was the only medically authorized foster home available at the time. The first time Mother advised Green that the Agency provided bus tickets did not cover transportation outside of Cuyahoga County was in October 2024. Maternal Grandmother provided transportation for Mother to attend the G-tube surgery and Mother's GAL had previously provided Mother with Uber transportation. University Hospitals and the Cleveland Clinic declined to offer G-tube training services to Mother because R.W.'s medical provider was Akron Children's Hospital.

{¶ 38} Green was aware that Mother had recently arranged with New Directions to assess mental-health, substance-abuse, parenting, life-skills and housing services but the appointment was scheduled for January 23, 2025, after the January 7, 2025 trial date.

{¶ 39} During cross- and recross-examination by R.W.'s GAL, Green confirmed that Mother was now 18 years of age, in the ninth grade, unemployed,

and reportedly lived with Maternal Grandmother whose pending Agency case involving Mother and her siblings had recently closed due to expiration of the statutory period. R.W. could not be placed with Maternal Grandfather due to issues with incarceration and substance abuse. Green also testified that the other KCARS were not suitable caregivers, primarily because they were unwilling or unable to handle R.W.'s special needs.

{¶ 40} Though Mother attended R.W.'s G-tube surgery, Green was not aware that the G-tube training was offered the day after the surgery, but Mother was not permitted to spend the night to remain for the training.

**B. GAL for R.W.**

{¶ 41} R.W.'s GAL recommended granting permanent custody to the Agency:

> We have a child with medical needs, a child that is vulnerable, unable to protect himself, cannot walk until now.
>
> And on the other side, even though any effort that [Mother] has been trying to do, at the end, she is 18, ninth grade, as testified by the Agency, no income.
>
> Unfortunately, her [Maternal Grand]mother's home also has been involved with the Agency, and they just recently closed a case.
>
> During the time of this proceeding, in the past, [Maternal Grand]father wanted her to be at her home, and young mother did not comply with his rules.
>
> So at the end, best interest for the child is to be in a safe environment where he can be attending all his medical appointments, and that is what this foster home has been doing until now.

The child is a beautiful boy, but he sits down and he has bright eyes, but he cannot even talk, but he makes a lot of noise that the foster mom can interpret those. But he needs a lot of attention and a lot of supervision.

And unfortunately, this Guardian ad Litem does not believe that mom will be able to do that.

Tr. 49-50.

**{¶ 42}** The GAL had not observed Mother with R.W. The witness explained:

The mom — Well, first because the visitations were through her and the social worker at the beginning, and I was not knowing which days she was attending and which days she was (inaudible) counsel. And then the visitations were done through the Agency. But she needs to comply with her (inaudible) training, which is back ten months ago, and she has no visitations, so I have not been able to observe her.

Tr. 51.

**{¶ 43}** There were no other witnesses presented by the parties. The sole exhibit introduced was a certified judgment entry and finding of facts dated September 18, 2023, adopting the August 30, 2023 magistrate's decision. The juvenile court adjudicated R.W. to be abused and dependent and granted temporary custody in the case.

## III. Final Judgment

**{¶ 44}** On January 8, 2025, the juvenile court granted permanent custody of R.W. to the Agency, terminating Mother's parental rights.

## IV. Assignments of Error

**{¶ 45}** Mother poses two assignments of error:

I. The juvenile court's decision to grant permanent custody to the CCDCFS is against the manifest weight of the evidence and the sufficiency of the evidence.

II. The judgment of the trial court must be reversed due to the ineffective assistance of counsel.

## V. Discussion

### A. Standard of Review

{¶ 46} The Supreme Court of Ohio has stated that "the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties." *In re Z.C.*, 2023-Ohio-4703, ¶ 11.

{¶ 47} The Court reiterated that "[s]ufficiency of the evidence and manifest weight of the evidence are distinct concepts and are '"both quantitatively and qualitatively different."'" *Id.* at ¶ 13, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

{¶ 48} "'[S]ufficiency is a test of adequacy,' *Thompkins* at 386, while weight of the evidence "'is not a question of mathematics, but depends on *its effect in inducing belief*[.]"'" (Emphasis in original.) *Z.C.* at *id.*, *quoting Thompkins* at 387, quoting *Black's Law Dictionary* (6th Ed.1990).

> "Whether the evidence is legally sufficient to sustain a verdict is a question of law." [*Thompkins*] at 386. "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when '"the evidence is legally sufficient to support the jury verdict as a matter of law."'" *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, 874 N.E.2d 1198, ¶ 3, quoting *Thompkins* at 386, quoting *Black's* at 1433.

*In re Z.C.* at ¶ 13.

{¶ 49} An appellate court must, when reviewing for manifest weight, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

> When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered. [*Eastley v. Volkman,* 2012-Ohio-2179, ¶ 20] "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶ 14.

{¶ 50} An appellate court may "'conclude that the judgment is against the manifest weight of the evidence'" "'even if a trial court judgment is sustained by sufficient evidence.'" *Id.* at *id.*, quoting *Eastley* at ¶ 12. Conversely, "a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment." *In re R.M.*, 2024-Ohio-1885, ¶ 46 (8th Dist.), citing *In re P.S.*, 2023-Ohio-144, ¶ 30 (8th Dist.), citing *In re*

*C.N.*, 2015-Ohio-2546, ¶ 9 (10th Dist.), citing *State v. Howze*, 2013-Ohio-4800, ¶ 10 (10th Dist.).

**B. Analysis**

{¶ 51} Parents have a constitutionally protected, fundamental interest in the management, custody, and care of their children. *Troxel v. Granville*, 530 U.S. 57, 66 (2000). The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.,* 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 52} To grant a motion for permanent custody, a juvenile court must determine that a two-pronged test has been met by clear and convincing evidence. Clear and convincing evidence is defined as

> "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."

*In re T.M.*, 2025-Ohio-843, ¶ 29 (8th Dist.), quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986).

{¶ 53} First, the juvenile court needs to determine that at least one of the conditions outlined in R.C. 2151.414(B)(1)(a)-(e) is applicable — establishing just one condition is sufficient. *In re A.M.,* 2020-Ohio-5102, ¶ 18; *In re L.W.,* 2017-Ohio-

657, ¶ 28 (8th Dist.). Second, the juvenile court must determine that terminating parental rights and granting permanent custody to CCDCFS is in the best interest of the child using the factors in R.C. 2151.414(D). *Id.*

{¶ 54} The Agency contended in the motion for permanent custody that the record clearly and convincingly establishes the existence of the condition listed in R.C. 2151.414(B)(1)(a), at least one factor of R.C. 2151.414(E), and the relevant factors of R.C. 2151.414(D)(1)(a)-(e). The affidavit supporting the motion avers R.W. has been adjudicated abused and neglected; Mother has failed to complete case-plan services for mental health, substance abuse, parenting, safe housing; and Mother lacks the ability to provide for R.W.'s basic and special medical needs.

## 1. First Prong — R.C. 2151.414(B) Factors

{¶ 55} The juvenile court journalized that by clear and convincing evidence R.C. 2151.414(B)(1)(a) had been met:

> (a) The child is not abandoned or orphaned or has not been in the temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period, if as described in division (D)(1) of section 2151.413 of the Ohio Revised Code, the child was previously in the Temporary Custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

The juvenile court found that R.W. cannot or should not be placed with a parent within a reasonable time or should not be placed with a parent.

{¶ 56} "[A] juvenile court must consider the factors outlined in R.C. 2151.414(E)" "[w]hen assessing whether a child cannot be placed with either of

the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a)." *In re L.H.*, 2024-Ohio-2271, ¶ 34 (8th Dist.), citing *In re A.V.*, 2014-Ohio-5348, ¶ 58 (8th Dist.); *In re R.M.*, 2012-Ohio-4290, ¶ 14 (8th Dist.); *In re B.P.*, 2019-Ohio-2919, ¶ 13 (8th. Dist.).

{¶ 57} "A juvenile court is only required to find that one of these factors is met in order to properly find that a child cannot or should not be placed with a parent." *In re L.H.* at ¶ 35, citing *In re Ca.T.*, 2020-Ohio-579, ¶ 27 (8th Dist.), citing *In re V.C.*, 2015-Ohio-4991, ¶ 42 (8th Dist.). In the instant case, the juvenile court determined by clear and convincing evidence that R.W. cannot be placed with Mother pursuant to sections of R.C. 2151.414(E)(1), (4), and (16).

{¶ 58} R.C. 2151.414(E)(1) provides:

> Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

The juvenile court found that "Mother has completed a parenting class but has not followed through completely with any other case plan services or drug screens."

{¶ 59} R.C. 2151.414(E)(4) declares:

> The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child.

Here, the juvenile court determined that Mother

shows inconsistent effort and follow-through on visitation, training on the child's medical needs, attendance (even virtually) at the child's many medical appointments despite being given appointments in advance. Mother does face transportation barriers but is inconsistent even with virtual opportunities to participate in [the] child's care.

{¶ 60} R.C. 2151.414(E)(16) covers "[a]ny other factor the court finds relevant." The juvenile court stated:

No father has come forward or been identified for this child. The child was born with very significant medical needs, developmental delays, and the child tested positive for marijuana at birth. Mother has not shown that she is willing to become medically competent at caretaking this child's long-term needs. While she has encountered some transportation issues the effort, engagement, and commitment to the child is inconsistent and she is not prepared to be able to provide a safe and secure home that would meet this child's significant needs. Mother is not participating in high school at this time despite being set up for online learning.

{¶ 61} The evidence, including the written GAL reports and SARs, clearly and convincingly supports the grounds listed by the juvenile court. Thus, we find that the first prong of the permanent custody analysis is supported by the manifest weight of the evidence.

## 2. Second Prong — R.C. 2151.414(D)(1) Best Interest Factors

{¶ 62} The "best interest determination" focuses on the child, not the parent. R.C. 2151.414(C); *In re Awkal*, 95 Ohio App.3d 309, 315 (8th Dist. 1994). "The discretion that the juvenile court enjoys in deciding whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's decision will have on the lives of the parties concerned." *Id*. at 316.

{¶ 63} To determine the child's best interest under R.C. 2151.414(D)(1), courts analyze the following factors, including any other factors the court deems relevant: (1) the interaction and interrelationship of the child with others; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and, (5) whether any of the factors in divisions R.C. 2151.414(E)(7) to (11) apply.

{¶ 64} The juvenile court stated it considered all of the factors under R.C. 2151.414(D)(1)(a)-(e) and 2151.414(E). While the court is required to consider all of the relevant factors in R.C. 2151.414(D(1)(a)-(e), it is not required to expressly discuss each one. *In re A.M.*, 2020-Ohio-5102, at ¶ 31. The juvenile court observed that while R.W. was too young to express his wishes regarding custody as set forth under R.C. 2151.414(D)(1)(b), the GAL recommended permanent custody. Granting permanent custody was also endorsed by Agency worker Green.

{¶ 65} Thus, the juvenile court found by clear-and-convincing evidence that placing R.W. in the permanent custody of the Agency was in R.W.'s best interest, R.W.'s return to Mother would be contrary to his best interest, and no relative was available, willing, or suitable to care for him.

{¶ 66} Mother argues that her 18th birthday occurred less than two months prior to the dispositional hearing and that she was not given sufficient time to complete her case-plan objectives under the circumstances and unhampered by her minority status.

{¶ 67} Mother cites in her appellate brief an excerpt from the adjudication entry as evidence of some of the challenges she faced:

> The child's mother (L.W.) is sixteen (16) years of age and in the eighth (8th) grade. The minor mother lives with her mother, R.R.W.'s maternal grandmother. The social worker Sophia George testified that the home is not appropriate. The family has been evicted from the home but still lives there; in essence, according to Ms. George, the family is squatting. The home is dirty, insect infested and animal feces have [sic] been observed in the home. Although Ms. George testified that the home is not appropriate for the minor child R.R.W., the CCDCFS *has deemed the home appropriate for the minor mother (L.W.).* Ms. George *could not explain the "mind boggling decision of the CCDCFS to allow one child [Mother] to live in an unsuitable and/or inappropriate housing while disallowing another child [R.W.] from living there.*
>
> Ms. George further testified that *she did not report* her observations of the maternal grandmother's home on August 26, 2023 to the CCDCFS Hotline or the worker assigned to the minor mother's home. In addition, there are no case plan services listed for maternal grandmother despite the housing and mental health concerns testified to by Ms. George.

(Emphasis in original.) Appellant brief, p. 2, citing Journal Entry No. 0917188579 (Sept. 18, 2023).

{¶ 68} Mother further contends, and posed an objection on the record, that the Agency did not use diligent or reasonable efforts to reunify her with R.W. and an extension of temporary custody would have allowed her to do so as she has been hampered by her age, indigence, and general lack of support.

{¶ 69} Agency worker Green testified that reasonable efforts were made to reunify Mother and R.W. The juvenile court stated on the record and the juvenile court journalized "reasonable efforts were made to . . . return the child to the home

and finalize a permanency plan, to wit: reunification." "Relevant services provided to the family include: The [M]other was referred for substance abuse, mental health, parenting and housing."

{¶ 70} The record supports, and the juvenile court determined, that other than the parenting class that was not tailored to assist Mother to meet R.W.'s needs, Mother failed to complete the case-plan services. The trial was continued from October 2024 to January 2025 at Mother's request to complete the case-plan services. At the time of trial, the appointment with the New Directions service provider referred in October 2024 had not yet taken place. The record also supports that the Agency provided bus passes and Uber transportation, but that Mother did not inform the Agency that the bus passes did not cover transportation to Akron until October 2024 and that Mother did not exhibit diligence in taking advantage of virtual communication options to interact with the caregiver, R.W., or the medical providers.

{¶ 71} The juvenile court's adjudication and permanent-custody-journal entries also reflect its recognition of the challenges Mother has faced during this case due to factors underlying Maternal Grandmother's case with the Agency involving Mother and her siblings.

{¶ 72} Mother also offers as a factor demonstrating the Agency's failure to meet its burden of proof that the GAL testified she never observed Mother and R.W. together, and objected to the GAL's report on the record. The GAL testified that she had not observed Mother and R.W. together due to Mother's failure to visit R.W.

including due to the lack of G-tube training. The testimony of Agency worker Green, the GAL reports, and the SARs reflect the difficulties of conducting in-person meetings with Mother and Mother's failure to appear for drug screens, case-plan services, Agency meetings at Mother's residence, and in-person visits of R.W.[6] Mother has cited no cases in support of her position on this assertion nor has she advanced how she was prejudiced based on the other evidence before the juvenile court.[7]

{¶ 73} "'"Reasonable efforts mean that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification."'" *In re R.D.W.*, 2021-Ohio-4304, ¶ 35 (8th Dist.), quoting *In re H.M.K.*, 2013-Ohio-4317, ¶ 95 (3d Dist.), quoting *In re D.A.*, 2012-Ohio-1104, ¶ 30 (6th Dist.).

> "'Reasonable efforts' does not mean all available efforts." *In re J.B*, 2020-Ohio-3675, ¶ 21 (8th Dist.), quoting *In re Lewis*, 2003-Ohio-5262, ¶ 16 (4th Dist.). "Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *In re K.M.*, 2004-Ohio-4152, ¶ 23 (12th Dist.). "'The issue is not whether [the agency] could have done more, but whether it did enough to satisfy the reasonableness standard under the statute.'" *In re S.F.*, 2013-Ohio-508, ¶ 21 (2d Dist.), quoting *In re Secrest*, 2002-Ohio-7096, ¶ 13 (2d Dist.); *In Re A.F.*, 2018-Ohio-310, ¶ 65 (2d Dist.); *In re K.W.*, 2018-Ohio-3314, ¶ 45 (8th Dist.). ("Whether an agency * * * made reasonable efforts pursuant to R.C. 2151.419 is based on the circumstances of each case, not whether there was anything more the agency could have done."). "In determining whether

---

[6] The Agency offers that the failure to appear for drug screens may be considered a positive result, citing *In re E.B.*, 2012-Ohio-2231 (2d Dist.).

[7] A failure to cite legal authority supporting an argument serves as grounds to refuse to address an assignment of error. *See Walsh v. Walsh*, 2023-Ohio-1675, ¶ 9 (8th Dist.), citing App.R. 16(A)(7) and 12(A)(2).

reasonable efforts were made, the child's health and safety shall be paramount." R.C. 2151.419(A)(1).

*Id.* at ¶ 35.

{¶ 74} This court has no doubt that Mother loves and desires to raise R.W. as is her fundamental right. *Troxel*, 530 U.S. at 65. However, the ultimate welfare of the child, which is the controlling principle to be observed, must prevail. *In re B.C.*, 2014-Ohio-4558, ¶ 20-21, citing *In re Cunningham*, 59 Ohio St.2d at 106.

{¶ 75} Mother has faced great difficulties, particularly during her minority status when public policy has determined a child deserves the protection of the community. However, Ohio law specifies that the best interest focus is on the child, R.W., not the parent. *See In re K.J.*, 2020-Ohio-4391, ¶ 37 (10th Dist.), citing R.C. 2151.414(C), which provides in part that "a court shall not consider the effect the granting of permanent custody to the agency would have upon any parent of the child."

{¶ 76} Upon our review of the record in this matter, this court finds that the juvenile court acted in accordance with the best interest and ultimate welfare of the child. After a thorough review of the record, we find the decision of the juvenile court to award permanent custody to CCDCFS was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Our finding that the judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment. *In re*

*R.M.,* 2024-Ohio-1885, at ¶ 46 (8th Dist.).  Therefore, Mother's first assignment of error is overruled.

## VI.  Ineffective Assistance of Counsel

### A. Standard of Review

{¶ 77} "An indigent parent is entitled to the effective assistance of appointed counsel when the state seeks to terminate her parental rights."  *In re A.C.,* 2013-Ohio-1802, ¶ 45 (8th Dist.), citing *In re L.C.,* 2022-Ohio-1592, ¶ 55. (8th Dist.). "[T]he test for ineffective assistance of counsel used in criminal cases is equally applicable in actions seeking to force the permanent, involuntary termination of parental custody."  *In re Heston,* 129 Ohio App.3d 825 (1st Dist. 1998), citing *Jones v. Lucas Cty. Children Servs. Bd.,* 46 Ohio App.3d 85 (6th Dist. 1988).

{¶ 78}  A strong presumption exists that counsel's "conduct falls within the wide range of effective assistance, and to show deficiency," Mother "must demonstrate that counsel's representation fell below an objective standard of reasonableness."  *In re S.P.,* 2021-Ohio-1822, ¶ 21 (8th Dist.), citing *State v. Bradley,* 42 Ohio St.3d 136, 142, (1989).  ""Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel.""  *Id.,* quoting *In Re W.T.,* 2009-Ohio-5409, ¶ 50 (2d Dist.), quoting *State v. Mitchell,* 2008-Ohio-493, ¶ 31 (2d Dist.).

{¶ 79}  Thus, Mother must demonstrate that counsel's performance was so deficient that she was prejudiced and denied a fair trial.  *State v. Trimble,* 2009-

Ohio-2961, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In other words, Mother must show that there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *State v. Dues*, 2014-Ohio-5276, ¶ 55 (8th Dist.), citing *Strickland* at 671.

**B. Discussion**

{¶ 80} Mother asserts that the only witnesses were Agency worker Green and R.W.'s GAL and that the bulk of the evidence offered at the dispositional hearing was based on Green's testimony. Though Mother refers to the testimony loosely as "hearsay," there is no accompanying legal argument. A failure to cite legal authority supporting an argument serves as grounds not to address an assignment of error. *See Walsh,* 2023-Ohio-1675, at ¶ 9 (8th Dist.), citing App.R. 16(A)(7) and 12(A)(2).

{¶ 81} It is not this court's duty to create a party's legal arguments. *State v. Quarterman*, 2014-Ohio-4034, ¶ 19. We explain in the interest of justice that "[h]earsay is an out-of-court statement offered to prove the truth of the matter asserted. Evid.R. 801(C). "If either element is missing — (1) a statement or (2) offered for its truth — the testimony is not hearsay." *State v. Washington*, 2024-Ohio-1056, ¶ 18 (8th Dist.), citing *State v. Holt*, 1999 Ohio App. LEXIS 4149, *8 (9th Dist. Sept. 8, 1996).

{¶ 82} A trial judge is presumed to be capable of disregarding improper testimony. *In re S.D-S.*, 2024-Ohio-255, ¶ 36 (8th Dist.), citing *In re Fountain*, 2000 Ohio App. LEXIS 672, *18 (8th Dist. Feb. 24, 2000). A parent must show that the court actually relied on improper hearsay evidence in reaching a decision. *Id.*,

citing *id.* Further, "'[t]he erroneous admission of hearsay evidence is harmless if other evidence, apart from the erroneously admitted evidence, has been offered to prove that which the challenged evidence was offered to prove.'" *Id.*, quoting *In re M.H.*, 2002-Ohio-2968, ¶ 73 (8th Dist.), citing *In re Decker*, 20 Ohio App.3d 203 (3d Dist. 1984).

{¶ 83} It is also true that a social worker is competent to testify to the case file of an agency under the hearsay exception for records kept in the ordinary course of business and public records and reports of the agency that the agency has a duty to report pursuant to law, i.e., R.C. 5153.17, citing Evid.R. 803(6) and (8). *In re Z.T.*, 2007-Ohio-827, ¶ 20-21. The Agency adds in its appellate brief that Agency worker Green testified about her interactions and discussions with Mother and with the school and that the testimony was "wholly sufficient . . . based on [Mother's] own admissions."

{¶ 84} For the cited reasons, this court determines that the evidence was not hearsay. "'[A] trial attorney does not violate any substantial duty in failing to make futile objections.'" *State v. Mathis*, 2019-Ohio-3654, ¶ 48 (8th Dist.), quoting *State v. Mitchell*, 53 Ohio App.3d 117, 119 (8th Dist. 1988). Counsel was not ineffective.

{¶ 85} Further, Mother's failure to proffer a properly developed legal argument in support of the hearsay contention and this court's determination that the record does not support a finding of hearsay renders this argument meritless.

{¶ 86} The second assignment of error is overruled.

## VII. Conclusion

{¶ 87} The juvenile court's judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

LISA B. FORBES, P.J., CONCURS;
MARY J. BOYLE, J., CONCURS IN JUDGMENT ONLY