[Cite as *In re T.M.*, 2025-Ohio-843.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

IN RE T.M., ET AL.                     :

                                              No. 114453
A Minor Child                          :

[Appeal by Mother, T.C.]          :

                                              :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 13, 2025

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD22900733 and AD22900734

---

***Appearances:***

Patrick S. Lavelle, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

MICHAEL JOHN RYAN, J.:

{¶ 1} T.C., mother ("Mother") of the subject twin children, T.M. and T.Y.M.
(the "Children"), appeals from the juvenile court's September 19, 2024 judgments
granting the motions of the Cuyahoga County Division of Children and Family

Services ("CCDCFS" or the "agency") to modify temporary custody to permanent custody.  After a careful and thorough review of the facts and pertinent law, we affirm.

**Factual and Procedural History**

{¶ 2}  The twin Children were born in August 2021.  Relative to this case, the agency's first contact with the family occurred in October 2021, when the Children were two months old.[1]  The record demonstrates that Mother was diagnosed with schizophrenia, and in October 2021, she had a crisis in the presence of the Children that required police intervention.  CCDCFS was granted custody of the twins via ex parte telephonic orders; they were placed with a maternal aunt, where they remained throughout the litigation.  The original complaints were dismissed for failure to reach resolution within the statutorily mandated timeframe.

{¶ 3}  The cases, which are the within cases, were refiled in January 2022, and the Children were recommitted to the predispositional temporary custody of the agency.  Thereafter, the Children were adjudged to be dependent and committed to the temporary custody of CCDCFS.  The temporary custody orders were extended twice.

{¶ 4}  In September 2023, CCDCFS filed motions to modify temporary custody to permanent custody.  In August 2024, trial was held on the motions.  The

---

[1] Mother has two other children who were earlier placed in the legal custody of their father.  The record shows that the same maternal aunt who is involved in this case raised the other two children.

agency presented the testimony of the assigned case worker and the Children's guardian ad litem ("GAL"), who testified to the following.[2]

{¶ 5} Case-plans were developed for the parents, with the goal of reunification. Mother's case-plan included engaging in mental-health treatment and counseling, obtaining safe and appropriate housing, and participating in parenting education courses. Father's case-plan included obtaining safe and appropriate housing, participating in parenting education courses, and providing basic needs for the Children. By both the case worker and GAL's accounts, Mother was engaged with her Children and vested in being reunited with them. Father had a "slow start" but the witnesses testified that they saw a change in him throughout the proceedings. Both Mother and Father completed parenting education. Mother addressed her mental-health and was medication compliant. Father improved with providing basic needs for the Children. In the beginning, Father was not properly co-parenting with Mother, but he later became engaged and improved. However, the case worker still observed some deficits; for example, Father never changed the Children's diapers or took them to the restroom.

{¶ 6} Safe and appropriate housing was a major concern for CCDCFS in this case. At the time the Children were initially removed from their parents' care, Mother and Father were living in a house that the agency deemed unsafe for the

---

[2] This appeal was initiated solely by Mother. However, the father of the Children, H.M. ("Father"), and Mother were a cohabitating couple and Father was an integral part of the proceedings in the juvenile court. Therefore, some discussion of Father is necessary and relevant.

Children. Specifically, the house was cluttered, to the point that the GAL described it as appearing as if hoarders lived there — "stuff" was everywhere. Cleanliness of the house was also concerning. Further, the house was older, the paint in the Children's bedroom was peeling, and there was debris that appeared to be chipped paint in the windowsill. The agency advised the parents about its concerns for lead poisoning. The parents had the room repainted, but the debris remained in the windowsill. There were also items — such as nails and screws — that would be dangerous for young children on the floor and the twins had a penchant for picking up items off the floor and putting them in their mouths. The parents eventually moved from that home and by the time of trial appropriate and safe housing was no longer a concern for the agency.

{¶ 7} However, CCDCFS still had concerns about the parents' ability to parent. Both the case worker and GAL specifically referred to the issues with the house they deemed unsafe as an example. Their visits to the house were announced, and they were concerned that, on their own, the parents would not know to remove what appeared to be paint chips from the Children's bedroom windowsill and pick up small objects such as nails and screws. Moreover, even after the concern about lead poisoning had specifically been mentioned to the parents, they repainted the Children's room but did not remove the debris from the windowsill — a simple fix that did not require money or much time.

{¶ 8} The case worker testified that he did not believe Mother demonstrated the benefit of her parenting education. According to him, Mother did

not seem to understand concepts. He testified that he would explain things to her, and then she would call him several times asking about what he had previously explained to her. The case worker explained that he found it to be different from her being concerned and invested in the case:

> I think it was the fact that it was the same issue that we'd had a conversation, and she said, okay. And she claimed that — she sounded like she understood, but then it was literally the exact same question verbatim that she would ask on a phone call, ask at a visit, and I would provide the exact same response. It was just like, I don't know, she just asked me the exact same question. Well, she presented it to me like she didn't understand what I was saying.

Tr. 73.

{¶ 9} The case worker testified that he did not believe Mother's understanding could be improved with further parenting education courses.

{¶ 10} The parents had two-hour-supervised-weekly visits with the Children; Mother was not always consistent with the visits, but she was appropriate during them. Because of what the agency described as deficits in Mother and Father's "parental instincts," the visits never advanced to being unsupervised or more than two hours a week.

{¶ 11} The Children were bonded to maternal aunt and her husband and doing well under their care. One of the Children was believed to have special needs, and the aunt and uncle were in the process of getting a diagnosis. The aunt and uncle were open to Mother and Father's involvement in the Children's lives. The parents did not take initiative in regard to spending more time with the Children, however. For example, they were welcomed to attend medical appointments but

rarely did. And despite living near the aunt, they did not visit the Children at the home. At the time of trial, the Children were three years old, and with the exception of the first two months of their lives, had lived continuously with the aunt and uncle.

{¶ 12} The GAL prepared a report, explained her report at trial, and was questioned by the parties at trial. The GAL recommended permanent custody to CCDCFS. She acknowledged and commended the parents' efforts in this case. The GAL explained that her concern with the parents was more than a dirty, cluttered house, admitting that her own house would not pass the "white glove test" and that almost every house has something in need of repair at any given time. Her concern was with Mother and Father's "parental instincts." It was her belief that returning the Children, who were three years old and had lived almost their entire lives with the aunt, would be an "experiment," because the parents had not spent more than two hours weekly with them, under supervision. The aunt and uncle told the GAL that they would adopt the Children, and the GAL felt confident that they would continue to being open to the parents' involvement in the Children's lives.

{¶ 13} In its judgments, the juvenile court found, by clear and convincing evidence, under R.C. 2151.414(B)(1)(d), that the Children have been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period and under R.C. 2151.414(E) that they "cannot or should not" be returned to Mother. The juvenile court further found that returning the Children to Mother was not in their best interest. The court also found that CCDCFS made reasonable efforts to prevent the Children's removal or to return them to Mother to effectuate the

permanency plan of reunification.  Mother now appeals and assigns the following three errors for our review:

    I.      The trial court's award of permanent custody to [CCDCFS], despite [CCDCFS's] failure to make reasonable efforts to eliminate the continued removal of the children from their home and to return the children to their home, violated state law and appellant's right to due process of the law as guaranteed by the Fourteenth Amendment of the United States Constitution and Section 16, Article 1 of the Ohio Constitution.

    II.     The trial court's decision to award permanent custody to [CCDCFS] was against the manifest weight of the evidence.

    III.    The trial court's failure to discuss the wishes of the children and their relationship with Mother in determining the best interests of the children constitutes reversible error.

**Law and Analysis**

**CCDCFS Made Reasonable Efforts to Reunify Mother with her Children**

{¶ 14}  In her first assignment of error, Mother contends that CCDCFS failed to make reasonable efforts to reunify the Children with her.  Specifically, Mother claims that the trial court failed to make adequate findings relating to reasonable efforts by CCDCFS under R.C. 2151.419 and that the agency failed to develop and implement sufficient case-planning services for her.

{¶ 15} Mother "concedes that existing precedent in this appellate district provides that such [R.C. 2151.419 reasonable efforts] findings are not required in permanent custody cases."  However, according to Mother, this court has misinterpreted the statute.

{¶ 16} Under R.C. 2151.419 the juvenile court is required to determine whether the public children services agency that filed the complaint in the case has made reasonable efforts to make it possible for the children to return safely home. This court and the Supreme Court of Ohio have held that R.C. 2151.419 does not apply to motions for permanent custody made under R.C. 2151.413, among other provisions; the agency's motions in this case were made under R.C. 2151.413. *See In re C.N.*, 2003-Ohio-2048, ¶ 37 (8th Dist.), and *In re C.F.*, 2007-Ohio-1104, ¶ 43. As the Ohio Supreme Court explained:

> R.C. 2151.419(A)(1) does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413. However, except for some narrowly defined statutory exceptions, the State must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights. If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time.

*In re C.F.* at *id.*

{¶ 17} As CCDCFS points out, appellate counsel for Mother has raised this argument before this court several times in other cases and it has repeatedly been deemed without merit. *See In re T.C.*, 2024-Ohio-6131, ¶ 49 (8th Dist.); *In re B.B.C.*, 2024-Ohio-588, ¶ 34-40 (8th Dist.); *In re B.P.*, 2023-Ohio-1377, ¶ 18-22 (8th Dist.); *In re I.A.-W.*, 2022-Ohio-1766, ¶ 14-21 (8th Dist.); *In re D.P.*, 2022-Ohio-135, ¶ 22-29 (8th Dist.); *In re J.J.*, 2021-Ohio-2594, ¶ 32-34 (8th Dist.); *In re Z.R.*, 2021-Ohio-1494, ¶ 15-19 (8th Dist.); *In re J.H.*, 2017-Ohio-1564, ¶ 10-26 (8th Dist.); *In re L.D.*, 2017-Ohio-1037, ¶ 18-26 (8th Dist.).

{¶ 18} The record here demonstrates that the juvenile court made reasonable efforts findings prior to and in conjunction with the permanent custody proceedings. When the Children were initially removed under the original complaint and placed in CCDCFS's custody, the juvenile court made the following findings:

> The Court further finds that reasonable efforts were made to prevent the removal of the child[ren] from the home, to eliminate the continued removal of the child[ren] from home, or to make it possible for the child[ren] to return home. The relevant services provided by the Agency to the family of the child[ren] and reasons why those services did not prevent the removal of the child[ren] from home or enable the child[ren] to return home are as follows: mental-health services for mother, attempted safety plan, Help Me Grow for the children. However, additional services must be completed to alleviate the risk to the child[ren].

{¶ 19} After dismissal of the first complaint and the refiling of this complaint, the juvenile court made another reasonable efforts finding as follows:

> The Court further finds that reasonable efforts were made to prevent the removal of the child[ren] from the home. Relevant services provided to the family and the reasons those services were not successful: Mother: parenting education, no referral. Mental-health, engaged with Signature Health. [CCDCFS] needs a referral.

{¶ 20} Further, when the Children were committed to the temporary custody of the agency, the juvenile court made the following findings:

> The Court finds that [CCDCFS] has made reasonable efforts were made to prevent removal of the child[ren], to eliminate the continued removal of the child[ren] from the home, or to make it possible for the child[ren] to return home. The case specific findings are: Mother's case-plan objectives are mental-health, parenting education and obtain housing. Mother is engaged with Signature Health.

{¶ 21} As mentioned, temporary custody was extended twice. On the first extension, the juvenile court made the following findings:

> [CCDCFS] has made reasonable efforts to finalize the permanency plan for the child[ren] and to make and finalize an alternative permanent placement. These efforts include offering the following services:
>
> Mother's case-plan objectives are mental-health, parenting education and housing. She is engaged in mental-health. She completed parenting education at Beech Brook. The case-plan shall be amended to include supportive services. Mother has obtained housing, however, it is not appropriate. Mother does not visit with the child[ren] on a consistent basis.
>
> Mother and Alleged Father have obtained housing, which is currently cluttered. They are in the process of remedying this.

{¶ 22} On the second extension of temporary custody the juvenile court made the following reasonable efforts finding:

> [CCDCFS] has made reasonable efforts to finalize the permanency plan for the child[ren] and to make and finalize an alternative permanent placement. These efforts include offering the following services:
>
> Mother has completed parenting classes. Mother's mental-health has been addressed with treatment and medication. She will contact her landlord to update and fix the required issues in the home.

{¶ 23} The trial court also made a reasonable-efforts findings in an April 16, 2024 order filed after a pretrial hearing, which was after CCDCFS filed its motion for permanent custody, stating:

> [CCDCFS] has made reasonable efforts to finalize the permanency plan for the child[ren] and to make and finalize an alternative permanent placement. These efforts include offering the following services:
>
> Mother Services include: Engage in the mental-health treatment and counseling, obtain safe and appropriate housing, and engage in parenting education courses.

The Court finds that [CCDCFS] reasonable efforts were made.

**{¶ 24}** The juvenile court made its final reasonable-efforts findings in its judgment granting CCDCFS's motion for permanent custody:

> The Court further finds that reasonable efforts were made to prevent the removal of the child[ren] from the home, or to return the[m] to the home and finalize a permanency plan, to wit: reunification. Relevant services provided to the family:

> For Mother: Engage [in] and benefit from mental-health services, obtain stable and appropriate housing, and provide for the children's basic needs.

**{¶ 25}** The record demonstrates that the juvenile court repeatedly made reasonable-efforts findings in this case, both prior to, and in granting, the agency's motion for permanent custody. The record further demonstrates that, despite Mother's allegation to the contrary, the agency developed a case-plan and made referrals for appropriate services to help achieve the goals of the case-plan.

**{¶ 26}** Specifically, Mother was referred to Signature Health for mental-health services and medication management to address her schizophrenia and was compliant with this treatment. She also engaged in a Beech Brook parenting program as referred but had difficulty comprehending some matters relating to the service. The case worker also testified that Mother struggled with understanding information he relayed to her. The case worker was of the opinion that Mother's comprehension struggles could not be corrected by her completing additional parenting services. Both Mother and Father were provided with a referral to the Community Collaborative for assistance in remedying their housing situation and

the agency offered to submit a new referral when advised of their dissatisfaction with the Collaborative assistance, but Father rejected the offer.

{¶ 27} This record demonstrates that CCDCFS charted a case-plan for Mother and made reasonable efforts to help her in achieving the goals of the case-plan. Further, the juvenile court documented the agency's reasonable efforts throughout the pendency of the case. The first assignment of error is therefore overruled.

## The Manifest Weight of the Evidence Supports the Juvenile Court's Permanent-Custody Judgment

{¶ 28} In her second assignment of error, Mother contends that the juvenile court's decision to grant permanent custody to CCDCFS was against the manifest weight of the evidence.

{¶ 29} "An appellate court will not reverse a juvenile court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence." *In re M.J.*, 2013-Ohio-5440, ¶ 24 (8th Dist.). The Ohio Supreme Court clarified this standard in *In re Z.C.*, 2023-Ohio-4703, stating that when reviewing a juvenile court's award of permanent custody and termination of parental rights, "the proper appellate standards of review to apply . . . are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards, as appropriate depending on the nature of the arguments that are presented by the parties." *Id.* at ¶ 18. Clear and convincing evidence is defined as

the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.

*In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986).

{¶ 30} In this second assignment of error, Mother challenges the termination of her parental rights under a manifest-weight standard.

When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*In re Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

{¶ 31} Juvenile courts apply a two-pronged test when ruling on permanent custody motions. *In re De.D.*, 2020-Ohio-906, ¶ 16 (8th Dist.). First, the court must find that any of the factors in R.C. 2151.414(B)(1)(a)-(e) apply. Second, the court must determine that terminating parental rights and granting permanent custody to the agency is in the best interest of the child or children using the factors in R.C. 2151.414(D). *Id.*

{¶ 32} Under the first prong of the analysis, the juvenile court here found that R.C. 2151.414(B)(1)(d) applied. This section provides:

[T]he court may grant permanent custody of a child to a movant if the court determines . . . by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to [CCDCFS] and that any of the following [(a) through (e) factors] apply:

. . .

(d) The child has been in the temporary custody of [CCDCFS] for twelve or more months of a consecutive twenty-two month period . . . .

{¶ 33} Under R.C. 2151.414(B)(1), "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." The Children were removed from their parents' care in October 2021; they were adjudicated dependent in March 2022. December 2021 (60 days after removal) is the earlier of the two dates, and since that time the Children continuously remained in the custody of CCDCFS up to the August 2024 trial date. Thus, they were in the agency's temporary custody for 12 or more months of a consecutive 22-month period. On this record, the juvenile court's finding under R.C. 2151.414(B)(1)(d) was supported by clear and convincing evidence.

{¶ 34} Although the trial court's finding under R.C. 2151.414(B)(1)(d) was sufficient to satisfy the first prong of the two-prong test, the trial court further found under R.C. 2151.414(E) that the Children "cannot or should not" be returned to Mother within a reasonable time. R.C. 2151.414(E) lists numerous factors for a juvenile court to consider in making such a determination. The juvenile court here found that R.C. 2151.414(E)(4) applied. That section provides as follows: "The parent has demonstrated a lack of commitment toward the child[ren] by failing to regularly support, visit, or communicate with the child[ren] when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home

for the child[ren.]" The "lack of commitment" and "cannot or should not" findings were supported by clear and convincing evidence.

{¶ 35} Safety issues in the home were a major concern for CCDCFS and this was repeatedly communicated to Mother. Yet, in the three years that the agency was involved with Mother, she, as the GAL testified, "lollygagged" and did not "have a sense of urgency" in addressing them. According to the GAL, it was as if Mother did not see the safety issues or could not comprehend what the safety issues were, despite being told. The GAL noted that her visits were announced and wondered, given that Mother had advanced notice of them, what the house would have looked like if the visits were unannounced. This raised concerns with both the GAL and the case worker about Mother's cognitive abilities.

{¶ 36} Visitation was also a concern. Upon the first extension in September 2022, the court noted that Mother did not visit with the Children on a consistent basis. Additionally, Mother never progressed beyond weekly two-hour-supervised visits with the Children. The GAL noted that Mother lived near her sister, the Children's foster mother, but did not reach out to help or visit with them. And one of the Children is believed to have special needs, and Mother had the opportunity to attend medical appointments, but only minimally did — for both Children.

{¶ 37} On this record, the trial court's "cannot or should not" and "lack of commitment" findings were not against the manifest weight of the evidence.

{¶ 38} Having found that the first prong for granting the permanent custody motion was satisfied, we consider the second prong: the best-interest

determination, which Mother challenges as part of her second assignment of error. Additionally, in her third assignment of error, Mother contends that the trial court erred by failing to explicitly discuss the best-interest findings in its judgment.

{¶ 39} In its judgment, the juvenile court stated that it "considered the following factors under [R.C.] 2151.414(D)(1)" for both children:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster caregivers and out-of-home providers, and any other person who may significantly affect the child.

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child.

(c) The custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period.

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

(e) Whether any factors in divisions (E)(7) to (11) of this section apply in relation to the parents and the child.

{¶ 40} We initially note that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, 2020-Ohio-5102, ¶ 31; *see also In re T.C.*, 2024-Ohio-6131, ¶ 51-54 (8th Dist.). Our review of the record demonstrates that all the best-interest factors weighed in favor of permanent custody to the agency. Specifically, although the Children responded well to Mother,

their interaction with her was limited and, at the time of trial, they were three years old and resided with their maternal aunt since they were two months old and were thriving. This court has stated that "'the mere existence of a good relationship is insufficient. Overall, we are concerned with the best interest of the child, not the mere existence of a relationship.'" *In re K.M.*, 2011-Ohio-349, ¶ 23 (8th Dist.), quoting *In re R.N.*, 2004-Ohio-2560 (8th Dist.).

{¶ 41} The Children were too young to express their wishes, but the GAL opined that permanent custody was in their best interest. She acknowledged and applauded Mother's efforts, but explained that she had concerns for Mother's "parental instincts."

{¶ 42} The Children, who were three years old at the time of trial, had been in agency care since they were two months old. The Children deserve a legally secure permanent placement, and the record demonstrates that that cannot be achieved without a grant of permanent custody, because as the juvenile court found, and we affirm, the Children "cannot or should not" be placed with Mother within a reasonable time. *See In re T.S.*, 2024-Ohio-827, ¶ 16 (8th Dist.) ("[A] trial court's finding that it cannot or should not place a child with a parent precludes the court from considering returning the child to Mother's custody.") And as already discussed, the record demonstrates Mother's lack of commitment toward the Children.

{¶ 43} We recognize that "termination of the rights of a birth parent is an alternative of last resort." *In re Gill*, 2002-Ohio-3242, ¶ 21 (8th Dist.). The purpose

of the termination of parental rights statutes is to make a more stable life for the dependent children and to facilitate adoption to foster permanency for children. *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.). This court does not look upon these matters lightly, and this case is certainly no exception. But in light of the above, there was competent, credible evidence supporting the juvenile court's determination. The Children have spent all but two months out of their approximately 36-plus months on earth in the care of their aunt and uncle. Denying permanent custody and returning them to their biological parents' care would be synonymous with ripping them from a loving and stable environment and placing them in an unpredictable, unknown, and uncomfortable environment. The latter situation could produce more trauma for the Children, and the juvenile court's obligation was to place them in the best environment that is conducive to growth and protection. There is an often-quoted African proverb: "it takes a village to raise a child." The Children here have a village with Mother, Father, aunt, and uncle; hopefully, the village will work together for the best outcomes for the Children.

**{¶ 44}** The second and third assignments of error are overruled.

**{¶ 45}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

EMANUELLA D. GROVES, P.J., and
ANITA LASTER MAYS, J., CONCUR