[Cite as *In re A.M.*, 2026-Ohio-1977.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE A.M., ET AL.            :

                                 No. 115864

Minor Child                :

[Appeal by T.M., Mother]     :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 28, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD 24908895, AD 24908896, and AD 24908897

---

### *Appearances:*

Wegman Hessler Valore and Matthew O. Williams, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee*.

KATHLEEN ANN KEOUGH, P.J.:

{¶ 1} Appellant-mother T.M. ("Mother") appeals from the juvenile court's judgment granting permanent custody of her minor children A.M., M.R., and P.R. to appellee Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). Mother raises the following assignments of error for review:

1. The trial court's decision to terminate appellant's parental rights and to award permanent custody of the children to CCDCFS was not supported by sufficient evidence.

2. The trial court's decision to terminate appellant's parental rights and to award permanent custody of the children to CCDCFS was against the manifest weight of the evidence.

3. The trial court's decision to terminate appellant's parental rights and to award permanent custody of the children to CCDCFS where CCFCFS failed to make reasonable efforts to reunify the family.

{¶ 2} After careful review of the record and relevant case law, we affirm the juvenile court's judgment.

## I. Procedural and Factual History

{¶ 3} Mother is the biological parent of A.M. (d.o.b. 03/18/2011), P.R. (d.o.b. 08/08/2016), and M.R. (d.o.b. 07/07/2017). S.M. ("Father 1") is the alleged biological parent of A.M. Mi.R. ("Father 2") is the alleged biological parent of P.R. and M.R.

{¶ 4} On August 30, 2024, CCDCFS filed a complaint for temporary custody, alleging that the children were neglected and dependent as defined in R.C. 2151.03(A)(2), (A)(3), and 2151.04(B).[1] Following a hearing, the children were committed to the emergency temporary care of the agency on September 18, 2024.

{¶ 5} On November 13, 2024, Mother appeared before a magistrate and stipulated to the allegations of an amended complaint that set forth the following particulars:

---

[1] The complaint includes references to a fourth child, X.F., who is not part of this appeal. In addition, Fathers 1 and 2 are not parties to this appeal.

1. Mother lacks stable and appropriate housing to provide appropriate care for the children.

2. Mother needs to consistently provide for the medical needs of A.M.

3. Mother needs to complete a mental health evaluation and follow through with all recommended treatment in order to provide care for the children.

. . .

6. Alleged father of P.R. and M.R., [Father 2], has been convicted of domestic violence. This matter remains unresolved with the Cleveland Municipal Court.

7. [Father 2] has failed to establish paternity and has failed to support, visit, or communicate with P.R. and M.R. on a consistent basis.

8. Alleged father of A.M., [Father 1], has failed to establish paternity and has failed to support, visit, or communicate with the child on a regular basis.

At the conclusion of the hearing, the children were adjudicated neglected and dependent and were placed in the temporary custody of the agency. On November 19, 2024, the trial court adopted the magistrate's decision and approved a case plan for reunification that was developed to address concerns with Mother's mental health, substance abuse, parenting, and housing. The case plan was later amended to include services related to domestic-violence prevention.

{¶ 6} On July 16, 2025, CCDCFS filed a motion to modify temporary custody to permanent custody pursuant to R.C. 2151.413. The motion was supported by the affidavit of CCDCFS social worker Delayna Campbell ("Campbell") who alleged that Mother (1) "does not have appropriate housing," (2) "has not progressed in her [case-plan] services," and (3) "has not shown a benefit from needed services." Campbell further alleged that Fathers 1 and 2 had not established paternity and

"failed to visit, support, or communicate with [the children] for a period of greater than 90 days."

{¶ 7} Following several continuances, the matter proceeded to a trial on November 18, 2025. On behalf of the agency, Campbell testified that she is employed as a child protective specialist with CCDCFS and was assigned to the children's case in November 2024. Campbell outlined the procedural history of the case and explained the circumstances that caused the children to be removed from Mother's care.

{¶ 8} During the pendency of this case, a case plan for reunification was developed, and amended as appropriate, to assist Mother in addressing the agency's ongoing concerns. In pertinent part, the case plan required Mother to (1) undergo a psychiatric/psychological evaluation, actively participate and complete any treatment recommendations, take all medications as prescribed, and sign a release of information; (2) establish and maintain appropriate housing and utilities for herself and the children; (3) work or otherwise establish an income source to meet the family's needs; (4) attend, participate, and successfully complete substance-abuse treatment and aftercare, maintain a drug free lifestyle, and submit to random urine screens as requested; (5) schedule and keep all medical appointments for A.M. and ensure her children's medical wellness; and (6) complete a domestic-violence class and follow all treatment or education recommendations.

{¶ 9} Mental-health objectives were included in the case plan because Mother "has a history of mental health issues and noncompliance with treatment."

(R. 37.) At the time Campbell was assigned to the children's case, Mother was enrolled in mental-health and medication-management services at the Alliant Treatment Center. However, Mother was inconsistent with her mental-health services and began missing scheduled appointments. Mother eventually discontinued her psychiatric services, against the recommendation of the provider, because she "felt that she did not need the services anymore." (Tr. 14.)

{¶ 10} In turn, substance-abuse objectives were included in the case plan because Mother "has a substance abuse disorder which has impacted her ability to meet the children's basic needs." (R. 37.) In late 2024, Mother was engaged in substance-abuse services at the Hitchcock Center for Woman. However, Mother was discharged from the program in March 2025 because "she was noncompliant with [the treatment center's] protocol." (Tr. 15.) Specifically, Mother was required to vacate the premises after she failed to return to the facility in time for a scheduled appointment. Mother did not take responsibility for her conduct and maintained that she "was being treated unfairly." (Tr. 15.) Prior to the discharge, Mother was engaged in services and testing negative for substances of abuse.

{¶ 11} After leaving Hitchcock, Mother did not have a designated residence and "was homeless." (Tr. 15.) During this time period, Mother was not engaged in services or submitting to monthly drug screens. In June 2025, Mother, then pregnant, began staying a Hannah's Home, a maternity home for single women. While at Hannah's Home, Mother completed a parenting education program and discussed reengaging in treatment services through Signature Health. Campbell

testified, however, that Mother left Hannah's Home without engaging in any intensive outpatient services as recommended. Mother did submit to a drug screen through Signature Health in June 2025, the result of which "was positive for cocaine and marijuana." (Tr. 18.) After this positive test, Mother agreed to return to Hitchcock for residential substance abuse treatment services. However, Mother was discharged from Hitchcock after just two weeks for "noncompliance." (Tr. 21.) More specifically, Campbell explained that Mother

> left for a medical appointment and then did not return back to the facility until around 4 a.m. When returning back to the facility, they had asked her to complete a drug screen. She had refused. She did not engage. She didn't want to work with them and come with a compromise. So they did ask her to leave the facility.s

(Tr. 21.) Thereafter, Mother did not comply with the agency's repeated requests for monthly drug screens. Mother also confirmed that she was continuing to use marijuana during her pregnancy. (Tr. 23.)

{¶ 12} Based on Mother's discharge from Hitchcock and her lack of compliance with the case plan, the agency determined that it was necessary to seek permanent custody of the children. Approximately three months after the motion for permanent custody was filed, Mother enrolled in substance-abuse services through Life Solutions. At the time of trial, Mother continued to use marijuana but was participating in an intensive outpatient treatment program. Mother also reengaged with anger-management, mental-health therapy, and medication-management services. However, the services were ongoing and not completed as of the date of trial. Campbell explained, for example, that Mother was just three days

into her outpatient treatment program and had completed only three weeks of a ten-week anger-management program. (Tr. 26 and 39.)

{¶ 13} Stable and appropriate housing also remained a concern for the agency. Following Mother's second discharge from Hitchcock, she moved into a one-bedroom apartment with the father of her youngest child, X.F. Campbell testified that the residence was not suitable for Mother and the children because it was too small for a family of six with a mix of ages and genders. Mother has applied for residence at Zelie Home, a shelter for single mothers, but did not hear back from the provider before trial. Additionally, Mother had no verifiable employment or source of income. Mother receives food stamps but has no other form of income to provide for the basic needs of the children. Thus, Campbell opined that as of the date of trial, Mother "still does not have appropriate housing." (Tr. 26-27.)

{¶ 14} With respect to visitation, Campbell testified that Mother was permitted weekly visits with the children. With the exception of a month-long absence following her discharge from Hitchcock in April 2025, Mother consistently attended the weekly visits with the children. Campbell testified that there have been no issues during visitation and that there is an observable bond between Mother and the children. Mother shows affection to the children and "tries to make visits as fun as possible." (Tr. 30.) In contrast, the alleged fathers were not involved in the children's lives and did not engage with the agency during the pendency of this case.

{¶ 15} Finally, Campbell provided extensive testimony concerning the children's current placement. The children are placed in separate foster homes due,

in part, to their combative interactions and individualized behavioral issues. Campbell testified that A.M. and P.R. are doing well in their foster homes. However, M.R. "struggles" in the foster home and school. (Tr. 32.) Each child receives individualized counseling to address certain behavioral issues. P.R. also participates in group therapy and M.R. receives intensive individual counseling twice a week. Campbell further testified that the agency attempted to identify suitable relatives for placement prior to trial. Their efforts, however, proved unsuccessful.

{¶ 16} Based on the foregoing, Campbell opined that Mother had not demonstrated a substantial benefit from her case-plan services and, therefore, had not remedied the conditions leading to the children's removal. Campbell further testified that she did not believe Mother is "able to provide a safe and stable home for the children." (Tr. 34.) If an extension of temporary custody was granted, Campbell doubted whether Mother could be reunited with the children at the end of the extension period. Campbell noted that Mother "still admits to smoking marijuana" and does not have an established sobriety date. (Tr. 34-35.) Campbell further reiterated that Mother has consistently failed to follow through with agency recommendations or successfully complete the services she has enrolled in during this case. Accordingly, Campbell believed that it was in the best interests of the children to award the agency permanent custody.

{¶ 17} At the conclusion of trial, the court heard from the child's guardian ad litem (the "GAL"). Although the GAL previously recommended permanent custody in her written report, she amended her recommendation based on the

testimony adduced at trial.  Specifically, the GAL opined that "it's in the children's best interests to grant a first extension of temporary custody."  The GAL summarized her position as follows:

> When I filed my report, I wasn't aware of the extent of mom reengaging in services.  I had talked to her in October, I guess this was around when she started , and I asked where she was engaged.  She didn't know the name of the place.  I didn't have a lot of details at that time, but I have more information now.
>
> So I believe she is reengaged in services.  The children, additionally, would like to go home.  They're very bonded with one another.  The visits go very well.  Mom's visiting regularly, they're bonded with mom.
>
> So I think at this time, a first extension would be in their best interests.

(Tr. 51-52.)

{¶ 18} On November 19, 2025, the juvenile court issued separate journal entries granting the agency's motions for permanent custody, thereby terminating Mother's parental rights.  This timely appeal followed.

## II. Law and Analysis

### A. Sufficiency and Manifest Weight of the Evidence

{¶ 19} In the first and second assignments of error, Mother argues the juvenile court's judgment granting permanent custody to CCDCFS is not supported by sufficient evidence and is against the manifest weight of the evidence.  Mother contends that the evidence presented at trial demonstrated, contrary to the juvenile court's findings, that there was hope for reunification within a reasonable time period.  Mother further suggests the juvenile court failed to adequately consider material facts, including "(1) the uncontested bond between Mother and her

children, (2) the expectation that she will soon be approved for housing, (3) her engagement in parenting and anger management programming, and (4) her reengagement in mental health and substance abuse counseling." Mother states that the juvenile court's "rush to judgment created a manifest injustice by destroying a family that could have been saved." Because these assignments of error are related, we address them together for the ease of discussion.

{¶ 20} We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. A parent has a "'fundamental liberty interest' in the care, custody and management" of his or her child, *In re Murray*, 52 Ohio St.3d 155, 156 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), and the right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 21} Because the termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" it is "an alternative [of] last resort." *In re J.B.*, 2013-Ohio-1704, ¶ 66 (8th Dist.), quoting *In re Hoffman*, 2002-Ohio-5368, ¶ 14; *In re Gill*, 2002-Ohio-3242, ¶ 21 (8th Dist.). It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 2015-Ohio-1028, ¶ 7 (8th Dist.), citing *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist. 1994). All

children have "'the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist. 1996). Where parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 1986 Ohio App. LEXIS 7860, 5 (5th Dist. Aug. 1, 1986).

### 1. Standard of Review

{¶ 22} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). This first prong of this statute authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been

adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state. R.C. 2151.414(B)(1)(a)-(e).

{¶ 23} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the juvenile court must then analyze whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D). "'Clear and convincing evidence is that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.,* 2023-Ohio-4703, ¶ 7, quoting *Cross v. Ledford,* 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 24} The Supreme Court of Ohio clarified the standard of review in permanent custody cases, explaining that

> [g]iven that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met . . . the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

*In re Z.C.* at ¶ 11.

{¶ 25} In reviewing a sufficiency-of-the-evidence challenge, we must examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof. *See id.* at ¶ 12, citing *Cross* at 477.

"When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

{¶ 26} With respect to Mother's challenges to the weight of the evidence supporting the juvenile court's judgment in this case, the Ohio Supreme Court has emphasized the importance of affording appropriate deference to the finder of fact, stating:

> "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." [*Eastley*] at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶ 14.

## 2. First Prong — R.C. 2151.414(B)

{¶ 27} With respect to the first prong of the permanent-custody analysis, the juvenile court found, pursuant to R.C. 2151.414(B)(1)(a), that the children were

neither abandoned nor orphaned, but they could not be placed with either parent within a reasonable time or should not be placed with their parents.

{¶ 28} When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E). *In re A.V.*, 2014-Ohio-5348, ¶ 58 (8th Dist.). A juvenile court is only required to find that one of these factors is met in order to properly find that a child cannot or should not be placed with a parent. *In re Ca.T.*, 2020-Ohio-579, ¶ 27 (8th Dist.), citing *In re V.C.*, 2015-Ohio-4991, ¶ 42 (8th Dist.).

{¶ 29} In this case, the juvenile court found the children could not be placed with either parent within a reasonable time or should not be placed with either parent pursuant to the factors outlined in R.C. 2151.414(E)(1), (4), (10), (14), and (16). These provisions provide as follows:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> . . .
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the

child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;

. . .

(10) The parent has abandoned the child.[2]

. . .

(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

. . .

(16) Any other factor the court considers relevant.

{¶ 30} After careful consideration, we find the record supports the juvenile court's determination that the children clearly and convincingly could not or should not be placed with either parent within a reasonable time. In this case, the children were removed from Mother's care based on concerns with domestic violence in the home and Mother's associated history of unstable housing, substance abuse, and mental-health issues. After the complaint was filed, the agency worked with Mother to facilitate reunification. As of the date of trial, however, Mother failed to complete significant portions of her case plan and, therefore, failed to substantially remedy the conditions that caused the children to be removed from her home.

{¶ 31} In this case, the evidence adduced at trial demonstrated that Mother was referred to numerous services throughout this case to address the issues identified in Mother's case plan. While Mother periodically engaged with many of

2 This factor applied only to the alleged fathers.

these services, she had not successfully completed the required services despite having more than a year to do so. Mother has voluntarily and involuntarily withdrawn from services before the programs were completed and has demonstrated an inability to adhere to rules or recommendations of her service providers. Mother was discharged from Hitchcock on two separate occasions for "noncompliance" before any meaningful progress was made towards the completion of her substance-abuse treatment. Following Mother's first discharge from Hitchcock, she completely disengaged from agency and had no contact with the children for approximately one month. Thereafter, Mother tested positive for cocaine and marijuana in June 2025, while pregnant, and has routinely failed to comply with the agency's repeated requests for monthly drug screens. Thus, Mother has no verifiable date of sobriety.

{¶ 32} We recognize that Mother reengaged with case-plane services approximately one month before the permanent custody trial and is enrolled in substance-abuse, anger-management, mental-health, and medication-management services. Nevertheless, we agree with the juvenile court's assessment that Mother's recent participation does not erase her inconsistent commitment to reunification, her pattern of noncompliance with treatment services, or her ongoing use of drugs during the pendency of this case. As noted by the court in its separate entries,

> Mother does not have appropriate housing, she has failed to maintain her sobriety, and continues [to] use substances despite being pregnant. Mother fails to consistently engage with substance use and mental health treatment.

{¶ 33} Collectively, these factors support the juvenile court's determination that Mother's eleventh-hour efforts were not sufficient to demonstrate substantial compliance with the various components of her case plan. *See, e.g., In re D.G.*, 2023-Ohio-4427, ¶ 28 (8th Dist.); *In re M.H.*, 2002-Ohio-2968, ¶ 34 (8th Dist.) ("[E]ven though mother had been drug-free for the six months preceding trial, her erratic history of drug-use and her unsuccessful attempts at so many other drug treatment programs does not leave this court convinced of mother's ability to remedy her drug dependency, on a long-term basis."). Mother's lack of progress towards her case plan further supports the juvenile court's finding that the statutory requirements for a first extension of temporary custody could not be satisfied in this case. R.C. 2151.415(D)(1) (stating that a trial court is authorized to grant a first six-month extension of temporary custody only if it finds, by clear and convincing evidence, "there has been *significant progress* on the case plan of the child[ren]"). (Emphasis added.)

{¶ 34} Finally, the record shows that Mother has not secured appropriate housing for the children. Mother was periodically unhoused and is currently residing in a home that cannot accommodate all of the children. Campbell further testified that Mother is unemployed and has no verifiable source of income. Viewed collectively, Mother has not taken the necessary steps to find an adequate permanent home for the children, despite having ample time to do so, and her access to appropriate housing in the future is speculative.

{¶ 35} Under these circumstances, we find that sufficient evidence supports the juvenile court's findings under R.C. 2151.414(E). Here, the testimony presented at trial highlighted Mother's failure or unwillingness to address the agency's substantial concerns with her ability to care for the children within a reasonable period of time. Moreover, we are unable to conclude that the juvenile court's findings were against the manifest weight of the evidence. The juvenile court was presented with all relevant information and was in the best position to weigh the evidence going to each R.C. 2151.414(E) factor. Accordingly, we find clear and convincing evidence supported the juvenile court's conclusion that the children could not or should not be placed with either parent within a reasonable time pursuant to R.C. 2151.414(B)(1)(a).

### 3. Second Prong: Best Interests of the Child

{¶ 36} Having determined that competent and credible evidence supports the juvenile court's finding that the child could not or should not be returned to either parent within a reasonable time, we now turn to the second prong of our analysis, which requires the court to determine, by clear and convincing evidence, whether it is in the best interests of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).

{¶ 37} "In determining the best interest of a child, a juvenile court 'may apply one of two different tests.'" *In re S.C.,* 2022-Ohio-356, ¶ 38 (10th Dist.), quoting *In re J.P.,* 2019-Ohio-1619, ¶ 39 (10th Dist.). "'Under R.C. 2151.414(D)(1), the juvenile court weighs multiple factors . . . to decide whether granting an agency

permanent custody of a child is in that child's best interest.'" *Id.*, quoting *In re J.P.* at ¶ 39. "By contrast, 'under R.C. 2151.414(D)(2), if the juvenile court makes [each of] the four enumerated findings, permanent custody is per se in the child's best interest and the court "shall" commit the child to the permanent custody of the agency.'" *Id.*, quoting *In re J.P.* at ¶ 39. "These two provisions 'are alternative means for reaching the best-interest determination.'" *Id.*, quoting *In re J.P.* at ¶ 40.

{¶ 38} In this case, the juvenile court applied R.C. 2151.414(D)(1) and found, by clear and convincing evidence, "that it is in the best interests of the [children] to be placed in the permanent custody of CCDCFS." Regarding the GAL's amended recommendation, the juvenile court determined that Mother had not made significant progress on the case plan and therefore, "a first extension of temporary custody cannot be ordered and would not be in the best interests of the [children]." The court further found that there was not "reasonable cause to believe that the [children] will be reunified with one of the parents or otherwise permanently placed within the period of the extension."

{¶ 39} R.C. 2151.414(D)(1) requires the juvenile court to consider all relevant factors in determining whether the child's best interests would be served by granting permanent custody. These factors include (a) the interaction and interrelationship of the child with the child's parents; (b) the child's wishes, as expressed directly by the child or through the child's GAL; (c) the child's custodial history; (d) the child's need for a legally secure permanent placement and whether that type of placement

can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1).

{¶ 40} A juvenile court must consider each of the R.C. 2151.414(D)(1) factors when making a permanent custody determination, but no one factor is given greater weight than the others. *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Only one of the factors set forth in R.C. 2151.414(D)(1) needs to be resolved in favor of permanent custody. *In re D.H.*, 2022-Ohio-2780, ¶ 46 (8th Dist.), citing *In re G.W.*, 2019-Ohio-1533, ¶ 72 (8th Dist.). Furthermore, the Ohio Supreme Court has held that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, 2020-Ohio-5102, ¶ 31.

{¶ 41} After careful consideration of the testimony presented at the permanent custody hearing, we find that sufficient evidence in the record supports the juvenile court's reliance on the factors set forth under R.C. 2151.414(D). Moreover, we cannot say that this is the exceptional case where the juvenile court lost its way and created a manifest miscarriage of justice in evaluating the best-interest factors.

{¶ 42} First, with respect to the children's relationship with their parents, siblings, relatives, and foster parents, the evidence conclusively established that the children do not share a relationship with their biological fathers or family relatives. At the time of the permanent custody hearing, A.M. and P.M. were doing well in their foster placements and their needs are being met. Campbell testified that M.R.

is "struggling" in her placement; however, she is actively enrolled in individual counseling to address her behavior issues.

{¶ 43} With respect to Mother, there is no dispute that she shares a strong bond with the children and has positive interactions with the children during supervised visits. With that said, however, Mother's positive interactions with the children, standing alone, are not indicative of her ability to provide for children's basic needs. This court has cautioned that "'the mere existence of a good relationship is insufficient. Overall, we are concerned with the best interest of the child, not the mere existence of a relationship.'" *In re K.M.*, 2011-Ohio-349, ¶ 23 (8th Dist.), quoting *In re R.N.*, 2004-Ohio-2560 (8th Dist.). "'[A] child's best interests require permanency and a safe and secure environment.'" *Id.*, quoting *In re Holyak*, 2001 Ohio App. LEXIS 3105 (8th Dist. July 12, 2001). Indeed, a child's relationship with his or her "biological family" can be "outweighed by [the child's] right to a stable and permanent home." (Cleaned up.) *In re K.M.* at ¶ 23. Here, Mother failed to substantially remedy the issues that caused the children to be removed from her care. Thus, Mother's relationship with the children did not outweigh or otherwise negate the agency's ongoing concerns with Mother's ability to safely parent the children.

{¶ 44} Under R.C. 2151.414(D)(1)(b), it is proper for the juvenile court to consider the GAL's recommendation where the children are too young to express their wishes. *In re M.D.*, 2022-Ohio-2672, ¶ 35 (8th Dist.). In this case, the children's GAL recommended an extension of temporary custody based on the

wishes of the children and Mother's recent enrollment in case-plan services. Upon review, however, we find the juvenile court acted within its discretion in choosing not to follow the oral recommendation of the GAL based on the totality of Mother's conduct during this case, including her pattern of noncompliance. This court has routinely recognized that "a trial court is not bound to follow a guardian ad litem's recommendation." *In re M.W.*, 2017-Ohio-8580, ¶ 24 (8th Dist.). Rather, "the decision of what is in a child's best interest is for the juvenile court upon a consideration of all the evidence presented." *In re C.T.*, 2021-Ohio-2274, ¶ 80 (8th Dist.).

{¶ 45} Regarding the (D)(1)(c) and (d) factors, there is no dispute that the agency was unable to identify a suitable relative for placement and that the children have remained in the agency's custody since September 2024. As discussed, the juvenile court's conclusion that the children could not be placed with a parent within a reasonable time or should not be placed with either parent was supported by findings consistent with R.C. 2151.414(E), any of which mandate that legal conclusion. Mother had approximately 14 months to take the necessary steps to remedy the substantial issues that caused the child to be placed in the agency's care. Her inaction or unwillingness to address each of the agency's concerns supports the juvenile court's determination that the children could not achieve a legally secure permanent placement without a grant of permanent custody. As stated by the court,

> the [children] deserve a safe, stable, and appropriate environment where [their] needs can be met and [they] can thrive. This cannot be

achieved with mother as she has failed continuously to remedy the conditions that lead to the removal.

{¶ 46} Balancing the foregoing factors, the juvenile court was free to conclude that the ultimate welfare of the children would be better served by an award of permanent custody. CCDCFS provided clear and convincing evidence regarding the children's custodial history, their need for legally secure permanent placement, and the significant issues Mother has yet to resolve. Accordingly, we find the juvenile court's award of permanent custody to CCDCFS is supported by sufficient evidence and is not contrary to the manifest weight of the evidence.

{¶ 47} The first and second assignments of error are overruled.

**B. CCDCFS's Reasonable Efforts**

{¶ 48} In the third assignment of error, Mother argues the juvenile court erred in granting permanent custody of the children to the agency because the agency failed to make reasonable efforts to reunify the family. Mother suggests that by filing the motion for permanent custody while she was engaged in case-plan services, the agency prematurely "abandoned her when she was at her most vulnerable and while it was mandated by law to assist her."

{¶ 49} Ohio's child-welfare laws "are designed to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.'" *In re C.F.*, 2007-Ohio-1104, ¶ 29, quoting R.C. 2151.01(A). In doing so, "R.C. 2151.419 requires the court to determine whether the public children

services agency that filed the complaint in the case has made reasonable efforts to make it possible for the child to return safely home." *In re C.N.*, 2003-Ohio-2048, ¶ 36 (8th Dist.). Nonetheless, the Ohio Supreme Court has recognized that "R.C. 2151.419(A)(1) does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413." *In re C.F.* at ¶ 43; *see also In re T.M.*, 2025-Ohio-843, ¶ 16 (8th Dist.).

{¶ 50} However, this does not relieve the agency of its duty to make reasonable efforts to reunify the child and parent. "At various stages of the child-custody proceeding, the agency may be required under other statutes to prove that it has made reasonable efforts toward family reunification." *Id.* at ¶ 42. To that end, and "[with] limited exception, an agency must make reasonable efforts toward family reunification during child-custody proceedings prior to the termination of parental rights." *In re N.C.*, 2025-Ohio-2012, ¶ 15 (8th Dist.), citing *C.F.* at ¶ 43. "If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *C.F.* at ¶ 43.

{¶ 51} In this case, the record is replete with orders issued by the juvenile court, prior to the permanent-custody hearing, finding that the reasonable efforts had been made by the agency. The court, for example, made a reasonable-efforts finding at the time of the children's removal and in the subsequent disposition of temporary custody. The record further demonstrates that the juvenile court included a reasonable-efforts finding in the permanent custody orders, stating:

The court further finds that reasonable efforts were made to prevent the removal of the [children] from the home, or to return the child to the home and finalize a permanency plan, to wit: reunification. Relevant services provided to the family include, For the Mother: basic needs/housing, parenting, substance abuse, mental health and domestic abuse services. The alleged father[s] did not make [themselves] available to the agency. For the child, counseling services.

{¶ 52} Under the foregoing circumstances, we cannot say that the juvenile court erred in finding that the agency made reasonable efforts to reunify the children with Mother and Father.

{¶ 53} The third assignment of error is overruled.

{¶ 54} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

---

KATHLEEN ANN KEOUGH, PRESIDING JUDGE

DEENA R. CALABRESE, J., and
TIMOTHY W. CLARY, J., CONCUR